IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. WESTON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RONNIE S. WESTON, APPELLANT.

Filed May 29, 2018.    No. A-17-347.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Affirmed.

Mark E. Rappl for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Ronnie S. Weston appeals from his conviction and sentence for one count of third degree sexual assault of a child following a bench trial in the district court for Lancaster County. In addition to raising claims of ineffective assistance of trial counsel, Weston contends that there was insufficient evidence to support his conviction and that the court imposed an excessive sentence. We affirm.

## II. BACKGROUND

An information was filed on September 16, 2016, charging Weston with one count of third degree sexual assault of a child, a Class IIIA felony (for a first offense), in violation of Neb. Rev. Stat. § 28-320.01(3) (Reissue 2016). Weston waived his right to a jury trial and the evidence adduced at the bench trial in February 2017 follows.

- 1 -

On the night of July 23, 2016, S.F. (age 14 at the time) and her friend, R.S. (age 15 at the time of trial), went over to Weston's residence. R.S. is Weston's half-sister; R.S. described her relationship with Weston as "[v]ery close." R.S. often spent time with Weston and spent the night at his residence, but S.F. had not met Weston prior to that night. According to S.F., when they arrived at Weston's residence, a girl "around our age" and "a little girl" were there. The girl close in age to S.F. was C.B., who was Weston's "ex-fiance's daughter," according to R.S.' mother; the younger child was Weston's daughter (who witnesses thought to be age 6 or 7). According to R.S., Weston was "supposed to be married to [C.B.'s] mom," but they never got married. R.S. said that she and C.B. were planning on living with Weston, and that C.B. is also 15 years old. Weston was 38 years old in July 2016.

S.F. testified that she, R.S., Weston, and Weston's daughter walked to a gas station from Weston's residence between 11 p.m. and 12:30 a.m. to get food, which they brought back to Weston's place. S.F. said that at about 1 a.m., she, R.S., and Weston went outside to play a game on their cellular phones. According to R.S., "all of us" went outside to play "Pokemon Go." S.F. said they returned to Weston's house around 2 a.m. Weston, R.S., and C.B. all drank some alcohol upon their return to the house. S.F. stated she was offered some, but did not drink any. S.F., R.S., C.B., Weston, and Weston's daughter all went to sleep between 4 a.m. and 4:50 a.m. They all went to sleep on a bed that was pushed into the corner of Weston's bedroom. R.S. was closest to the wall, S.F. was next to her, Weston's daughter was next to S.F., and Weston was next to his daughter. C.B. slept across the bottom of the bed. S.F. stated she received a phone call around 4:50 a.m., and after that she went to sleep. S.F. also remembered that at some point Weston lifted his daughter off of the bed and moved her onto the floor, and then came back to bed. R.S. also testified that she woke up once and saw that Weston's daughter was no longer between S.F. and Weston; Weston's daughter was on the floor. Both S.F. and R.S. testified that Weston was then next to S.F. in the bed. When R.S. woke up, she saw both C.B. and Weston's daughter laying together on the bottom of the bed, and S.F. and Weston "were laying together . . . they were, like really close" and facing the same direction towards R.S.

S.F. stated she went to bed wearing a short sleeve shirt and tank top, a bra, underwear, and shorts. According to S.F., she was facing away from Weston in the bed. Weston put his arm around her stomach, and was touching her. He first "was messing" with her shirt, and then unbuttoned and unzipped her shorts. He then put his hand into her shorts, under her underwear, and touched her "vaginal area." He stopped touching her briefly, and then he did it again, though she could not say for how long the touching occurred. She did not remember if he said anything to her while he was touching her, and she did not say anything to him. When asked if she fell back asleep after Weston stopped touching her, she replied, "I - yeah. I mean - didn't wake up at any point in the night while I was sleeping except for just to move around."

When S.F. woke up at 6:30 a.m. on July 24, 2016, R.S. was already awake and was on her phone. Weston's daughter and C.B. were still sleeping, and Weston was not in the bedroom. S.F. said her shirt and tank top "was up" and her shorts were unbuttoned and unzipped. S.F. did not tell R.S. what happened initially, but typed out a note on her cell phone "to remember what happened that night" while she was still lying in bed. A picture of the note on her cell phone was admitted

into evidence. R.S. testified that S.F. was crying, so R.S. asked her what was wrong. S.F. would not tell her, but R.S. noticed that S.F.'s "shirt was up and her pants were zipped down."

S.F. stated she and R.S. eventually went outside where Weston was working on his car. After 5 minutes, S.F. went back inside the residence and was crying in the bathroom for approximately 15 minutes. She then called R.S.' mother to ask her to come and get her and R.S. because she "didn't want to be at [Weston's] house . . . [b]ecause of what happened." When she talked with R.S.' mother, S.F. said, "I was crying. I was upset. I didn't know what to do. All I knew is that I wanted to leave." She told R.S.' mother what had happened with Weston.

S.F. testified that R.S. found her in the bathroom, and that she hesitated to tell R.S. because she was her best friend, and that her best friend did not need to hear what happened, especially since it involved R.S.' brother. However, S.F. told R.S. what had happened, and after R.S. left, S.F. then went into one of the bedroom closets because R.S. and Weston were looking for her. R.S. came into the closet with her, and Weston began apologizing and told her "I'm so sorry. I thought you were of age." He then told her she should call the police if she wanted to, but S.F. did not respond to him. R.S.' mother arrived and took S.F. and R.S. to her house; S.F. then contacted her mother.

R.S. testified that she and S.F. met in middle school when she was 12 or 13 years old, and they were close friends. R.S. provided a similar description of the events leading up to the group going to sleep together in the early hours of July 24, 2016. She stated she woke up around 6 a.m. and everyone else was still asleep. Weston's daughter and C.B. were sleeping at the bottom of the bed, Weston and S.F. were "laying together," and she described them as "really close" and facing the same direction.

According to R.S., shortly after she had awakened, Weston got up and went to the bathroom and started playing music. While still lying in bed, R.S. saw S.F. wake up and start crying. R.S. asked her what was wrong, but S.F. would not tell her. She noticed S.F.'s "shirt was up and her pants were zipped down." R.S. and S.F. stayed in bed until 7 a.m., at which time Weston asked R.S. for help fixing his truck. R.S. left the bedroom to go help Weston, and S.F. came out and sat on the porch but did not help. R.S. stated that S.F. "wouldn't talk to me; she was distant," and R.S. was texting her and "[S.F.] didn't act - seem right."

R.S. noticed at some point that S.F. was not outside anymore, and she found her inside the residence in the bathroom crying. When S.F. would not tell her why she was crying, R.S. went back outside and then returned 10 or 20 minutes later. S.F. was still in the bathroom and was just getting "off the phone with someone." S.F. handed R.S. her cell phone and told R.S. to read it. R.S. said "[i]t was on the notes." R.S. testified that after reading the note, she "just . . . knew it somehow," but she "didn't want to believe it, but [she] knew it." She explained, "Because when I saw her pants undone and her shirt up, I thought of something because they were laying really close together." R.S. told S.F. she "was going to confront" Weston about what happened.

When confronting Weston, R.S. told him S.F. was "only 14" and according to R.S., Weston responded that "he was going to hell." Weston said he wanted to apologize to S.F., so Weston and R.S. then went to find S.F., who they found in a bedroom closet. Weston apologized to S.F. and told her if she wanted to "call the cops" he would "tell them the truth." She stated S.F. was on her cell phone and did not respond. R.S. and Weston began arguing, and according to R.S., Weston

said that S.F. "doesn't look 14 because of her nose piercing." S.F. texted R.S. that R.S.' mother was there, so the two girls went outside and left with R.S.' mother. Later that morning, R.S. received text messages from Weston. Screen shots of R.S.' cell phone were received into evidence; R.S. confirmed these messages were received from Weston "that morning." A message from Weston to R.S. at 8:41 a.m. said, "Forgive me and at my funeral don[']t let them say anything bad about me." R.S. responded with a text stating, "Stop." The next text from Weston's cell phone stated (punctuation and capitalization as seen in screen shots):

> I need to find some place for [my daughter] to go...I'm about to lose everything that i worked hard for...So [my daughter] will need some place to go...I would rather her go to family and not the state...I will never be the same again...I hate myself right now...So if i go to jail, die or leave please make sure she goes to some kind of family...You can't tell anyone ever...I couldn't never fix this and I should have known better...Love always your failure of a brother.

R.S.' mother testified that S.F. called her on the morning of July 24, 2016, and when she answered, S.F. was "hysterically crying" and eventually told her that Weston had "touched" her. R.S.' mother said S.F.'s voice "was very shaky" and she could hardly understand her. "She was sobbing, hysterically crying. Like, loudly crying." Over defense counsel's hearsay objection, R.S.' mother was permitted to testify that S.F. told her that Weston touched S.F. and that S.F. said "she woke up and her shirt was pulled up and her pants were unzipped." R.S.' mother then picked up S.F. and R.S. from Weston's residence, and when S.F. got into the car, she gave R.S.' mother a hug and told her she "could not believe it happened." They returned to R.S.' mother's residence and contacted S.F.'s mother. R.S.' mother also testified about the impact of this event on R.S., stating, "She was very sad. She was in tears. She was wanting to harm herself. She was blaming herself for this incident." According to R.S.' mother, R.S. went to the hospital for a week for "trying to take pills."

S.F.'s mother also testified. She provided S.F.'s date of birth, and talked about the events of July 24, 2016. When she arrived at R.S.' house, S.F. "was very upset" and "was in tears." S.F.'s mother's first reaction was "to pay somebody a visit," because she "was pissed off." She tried to call Weston but nobody answered, so she headed toward his residence. During the drive there, she was persuaded to stop and she instead called the authorities from a convenience store. A uniformed officer took her report and S.F.'s mother then took S.F. to an emergency room hospital to have "a rape kit be done on [her] daughter." S.F.'s mother also reached out to the Child Advocacy Center and a private therapist to help S.F. cope with her emotions.

The State also called Lincoln Police Department officers to testify. One officer discussed being dispatched to meet with S.F.'s mother and S.F. on July 24, 2016, at the convenience store. Another officer transported Weston to jail. Another officer, a family crimes investigator, watched the forensic interviews of S.F. and R.S., and conducted an interview of Weston once he was in custody. A "DVD" copy of that officer's interview with Weston, along with a transcribed copy of the interview, were received as evidence without objection from defense counsel. The family crimes investigator discussed giving Weston his *Miranda* warnings and having Weston sign a *Miranda* warning and consent form; Weston also signed a consent form for the search of his cell

phone and provided instructions for getting past the cell phone's security. Finally, a fourth officer testified about cell phone forensics and how evidence was extracted from Weston's cell phone. Over defense counsel's objection, a 19-page exhibit was received which contained messages received or sent on Weston's cell phone between July 22 and August 1, 2016, including where messages were deleted. R.S.' messages were also extracted from her cell phone.

We note that during Weston's interview with the family crimes investigator, Weston claimed the girls made this up because he would not give R.S. the $600 she was requesting for herself and another $600 for S.F. Weston said when everybody laid down in the bed, he was not there very long when he got up and left to "go smoke a blunt." Weston claimed he apologized to S.F. because she was crying and she was in his home. Weston said he had too much going on in his life to do something like this, and if he wanted "pussy," he had "15 fuckin' females" who could "bring it to me like that," so there was "no way in hell" he was going to "mess with some 14 year old," especially with his daughter laying there. He denied touching "this girl" and claimed "all hell broke loose" when he would not give them the money requested.

After the State rested, trial was continued to the following morning. Weston rested without offering evidence and moved to dismiss the information. The court overruled the motion and proceeded to closing arguments. Weston's trial counsel argued that the evidence of Weston's interview with the police investigator shows that the girls were extorting money from Weston, and that "[t]hese two girls cooked this up." And regarding the text messages, Weston's trial counsel argued "that all the technology in the world doesn't tell us whose thumbs were on the button of a phone." The State reminded the court of the content of Weston's text messages, and also discussed the adverse impact of the event on both S.F. and R.S., including the need for R.S. to be hospitalized for depression immediately afterwards.

After closing arguments, the district court called for a recess to allow the court time to review the evidence. Upon reconvening, the court found Weston guilty beyond a reasonable doubt of the charge in the information. A sentencing hearing took place on March 9, 2017, and an order was entered the same day sentencing Weston to 3 years' imprisonment and 18 months' postrelease supervision, to be served consecutively to any other sentence being served at the time of sentencing. Weston appeals.

### III. ASSIGNMENTS OF ERROR

Weston claims he had ineffective assistance of trial counsel in several respects. He also asserts there was insufficient evidence to support his conviction and the court imposed an excessive sentence.

### IV. STANDARD OF REVIEW

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Lane*, 299 Neb. 170, 907 N.W.2d 737 (2018). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

## V. ANALYSIS

### 1. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Weston alleges several specific instances of ineffective assistance of trial counsel and is represented on direct appeal by counsel different from the counsel who represented him at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lane, supra*. However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.* And, an ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018).

In order to show ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 205, 280 L. Ed. 2d 674 (1984), a defendant must show, first, that counsel was deficient and, second, that the deficient performance actually caused prejudice to the defendant's case. *State v. Hill, supra*. The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Glass*, 298 Neb. 598, 905 N.W.2d 265 (2018). A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.*

An appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance. *State v. Lane, supra*. An ineffective assistance of counsel claim is raised on direct appeal when allegations of deficient performance are made with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.*

(a) Failure to Properly Cross-Examine and Impeach

Weston asserts that his counsel failed to properly cross-examine and/or impeach S.F. and/or R.S. He points specifically to S.F.'s testimony that she did not know how long a period of time there was between Weston first putting his hand underneath her underwear until he stopped the last time he did it. S.F. said she did not know because she was sleeping, saying she could not know how long something lasts when sleeping. Weston claims trial counsel failed to confront S.F. regarding this statement, and that counsel was deficient by failing to ask S.F. "how she would be able to remember some details while sleeping but not others." Brief for appellant at 13.

Weston also claims his trial counsel failed on three different occasions to properly impeach S.F. during cross-examination over prior inconsistent statements, and after the State's objections to each of those attempts was sustained, "trial counsel simply moved on." Brief for appellant at 13-14. Weston directs us to three instances of trial counsel's questioning: (1) when S.F. was asked if she remembered telling the Child Advocacy Center interviewer about not sleeping for almost a week so she "kind of blacked out," (2) when S.F. was asked about saying in her interview that after she had fallen asleep, she received a call from a friend at 4:15 a.m., and (3) when S.F. was asked if she believed she had been "dreaming this," and S.F. responded, "No." Weston argues that S.F.'s credibility remained intact because "evidence that she changed her story was not received." Brief for appellant at 14. "Specifically, evidence of S.F.'s statements to the [Child Advocacy Center] interviewer, 'I thought I was having a nightmare,' and 'I kind of blacked out,' were not admitted for impeachment." *Id.*

However, further testimony was elicited from S.F. by defense counsel. The following colloquy took place:

[Defense Counsel]: So when you said that you had blacked out, that was incorrect.

[S.F.]: No. That was correct.

[Defense Counsel]: So, blacking out is not a sound sleep in your - you?

[S.F.]: I fell asleep hard.

We find the record is sufficient to address all of the above-noted claims. Most significantly, S.F. did not dispute that she was exhausted and fell asleep deeply. However, this does not mean she was constantly asleep and incapable of recollecting what transpired during those early morning hours. For example, S.F. testified that after she received the telephone call from her friend, she fell asleep "right after" and Weston's daughter was still lying next to her at that time. She was subsequently awake when Weston moved his daughter to the floor and returned to the bed next to her. She again fell asleep but was awake when Weston's hand was unbuttoning and unzipping her shorts and he put his hand underneath her underwear and touched her vaginal area. She said it was an "on and off thing," "[i]t stopped, then it happened again." She did not know how long it was between times because she "was sleeping," and she did not have "anything around [her] to look at," to know the time. And even if she had previously stated she thought she was having a nightmare, this characterization of her experience is not inconsistent with her testifying that she did not dream this experience. It is clear that trial counsel challenged S.F.'s credibility as to her

recollection of events which occurred while she was sleeping. There was no deficient performance, thus, these claims of ineffective assistance of counsel fail.

Weston further asserts that trial counsel should have attempted to impeach S.F. regarding a statement she made to the police officer who met S.F. and her mother at the convenience store, specifically that the officer's report indicated that S.F. told him that R.S. had told her that Weston had touched her. However, this particular officer testified at trial that he spoke with S.F. for only 5 minutes, and that she showed him some words on her cell phone. When asked if he obtained a comprehensive report or minimal information from S.F., the officer responded, "Minimal information." The officer explained that they want to minimize the number of times a victim has to explain what happened to them, and they were standing in the parking lot of a convenience store which he did not deem a fitting place to conduct an in-depth interview. Further, the officer testified that there are procedures in place to conduct such interviews, and after speaking with S.F., he was of the opinion that there was a crime that needed further investigation. Further, it is unclear how Weston's trial counsel could impeach S.F. with the officer's report containing his recollection of the information he obtained during the 5 minutes he spoke with S.F. at the convenience store. Trial counsel was not deficient in attempting to impeach S.F. with this officer's report. This claim also fails.

Finally, Weston asserts that trial counsel failed to adequately cross-examine R.S. about attempting to extort money from Weston and making up allegations. As an example, Weston points out that trial counsel did not question R.S. about her alcohol use that night and how it could have potentially impacted her memory. However, trial counsel did question R.S. about trying to get money from Weston. R.S. admitted to asking for $400 "a week before," and Weston's answer was no. Trial counsel then specifically questioned R.S. about asking Weston for $600 for herself and $600 for S.F. when they went over to his house. When R.S. denied asking for money that day, trial counsel also asked, "[I]sn't it true, then, that he - since he refused to provide you that money, that you and [S.F.] made this up?" R.S. said, "No." Trial counsel also asked R.S. if the reason she had to be hospitalized was because she felt so bad about what she was doing to her brother. R.S. again responded, "No." Counsel was not deficient in failing to question R.S. about possible motives for making false allegations, as the record demonstrates that counsel did pursue questions in this regard.

Further, with regard to more deeply exploring R.S.' consumption of alcohol, there is simply no evidence in the record that R.S.' ability to recollect events was impaired by any alcohol consumption. Even Weston's description of activities through the evening was fairly consistent with what the girls reported. Weston admitted being in bed with all the girls, but he claimed he was not there very long. Further questioning of R.S. as to her alcohol consumption was not relevant to the issue of Weston's behavior that evening, nor would it have any bearing on the credibility of R.S.' reporting of events which was fairly consistent with S.F.'s reporting. Notably, S.F. did not consume any alcohol. This claim of ineffective assistance of counsel fails.

Weston argues that "had S.F. and R.S. been properly impeached and cross-examined, there is a substantial likelihood the result would have been different." Brief for appellant at 15. We disagree. For the reasons already set forth, these claims of ineffective assistance of trial counsel all fail.

(b) Failure to Call Witnesses and Take Depositions

Weston next argues that he received ineffective assistance of counsel because his trial counsel failed to contact potential witnesses, Brandon Gustafson and Dustin Gustafson, and failed to depose S.F. and R.S. As the State correctly notes, the record contains no information as to what the Gustafsons' testimony might have been, nor why they were not called as witnesses. There is also no information as to whether or not S.F. and R.S. were deposed, or why Weston's trial counsel chose not to depose them, if that was the case as Weston alleges. Therefore, we cannot make any meaningful determination whether trial counsel made a reasonable strategic decision as to these matters, and we conclude that the record on direct appeal is not sufficient to adequately review this claim.

(c) Improperly Advising to Waive Jury Trial

Weston also alleges his trial counsel was ineffective because counsel did not "properly advise him of the pros and cons of waiving his right to a jury trial and having a trial before the judge." Brief for appellant at 16. Weston claims trial counsel advised him it would be easier to convince 1 person rather than 12, and this advisement was "particularly improper because the trial judge had recently sentenced [Weston] to a maximum term of imprisonment on an unrelated matter." *Id.* There is no evidence in the record before us regarding what advice Weston's trial counsel did or did not give him regarding this matter or any strategy that might have been involved. Therefore, we conclude the record on direct appeal is not sufficient to adequately review this claim.

(d) Failure to Seek Recusal of Presiding Judge

Finally, Weston argues his counsel was ineffective for failing to move to recuse the presiding judge. He argues the judge "had recently sentenced [Weston] on an unrelated matter and had thoroughly reviewed his Presentence Investigation Report in that case," and "[t]he judge knew intimate details about [Weston], his history, and his life at the time of trial." Brief for appellant at 16. He concludes "[a] reasonable person would likely question a judge's impartiality when that judge has been exposed to a substantial amount of information, some of which is very unflattering, prior to deciding that individual's guilt or innocence." *Id.* at 16-17.

We find Weston's counsel was not ineffective for failing to file a motion to recuse the judge.

> The right to an impartial judge is guaranteed under the Due Process Clause of the 14th Amendment to the U.S. Constitution and the due process clause of the Nebraska Constitution, the parameters of which are coextensive. . . . This right extends to both the trial and the sentencing hearing. . . . In order to show a constitutional violation of the right to an impartial judge, a defendant must prove actual bias or structural error. . . . Structural error occurs when the defendant shows that a judge had such a strong personal or financial interest in the outcome of the trial that he or she was unable to hold the proper balance between the state and the accused.

*State v. Thomas*, 268 Neb. 570, 579, 685 N.W.2d 69, 78-79 (2004) (citations omitted). Weston does not argue on appeal that there was actual bias or structural error.

Weston argues "'a judge should recuse himself or herself when a litigant demonstrates that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown.'" Brief for appellant at 16 (quoting *State v. Thomas*, 268 Neb. at 581, 685 N.W.2d at 79-80). Absent extraordinary circumstances, in order to disqualify a judge based upon the appearance of impropriety, the bias and prejudice must stem from a nonjudicial source and not from what the judge learned from his or her prior involvement in the defendant's case or cases that concerned parties or witnesses in the defendant's case. *State v. Thomas, supra*.

Weston does not argue there are extraordinary circumstances and we do not find any in the record. Therefore any prejudice to Weston must stem from a nonjudicial source. In this case, Weston's argument stems from the judge's access to a presentence investigation report (PSI) for Weston in a separate case, which is a judicial source. Therefore, a motion to recuse on this basis would have been without merit. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018). Therefore, Weston's counsel was not ineffective for failing to move to recuse the presiding judge.

### 2. SUFFICIENCY OF EVIDENCE

Weston asserts there was insufficient evidence to support his conviction. He was convicted of one count of third degree sexual assault of a child under § 28-320.01, which states in relevant part:

> (1) A person commits sexual assault of a child in the second or third degree if he or she subjects another person fourteen years of age or younger to sexual contact and the actor is at least nineteen years of age or older.
> . . . .
> (3) Sexual assault of a child is in the third degree if the actor does not cause serious personal injury to the victim. Sexual assault of a child in the third degree is a Class IIIA felony for the first offense.

Sexual contact is defined under Neb. Rev. Stat. § 28-318(5) (Reissue 2016) as
> the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. . . . Sexual contact shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact shall also include the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual assault of a child under sections 28-319.01 and 28-320.01.

"Intimate parts means the genital area, groin, inner thighs, buttocks, or breasts." § 28-318(2). Weston concedes on appeal that "[he] is a person nineteen years or older and that S.F., at the time of the alleged offense, was a person fourteen years old or younger." Brief for appellant at 17. He argues, however, that "no rational trier of fact could have found that sexual contact occurred or that [Weston] intended to subject S.F. to sexual contact." *Id*. Weston points out that S.F. stated

- 10 -

she was extremely tired and "claimed to be able to remember being touched by [Weston], even though she was asleep and sleeping hard." *Id*. at 18. Weston acknowledges that R.S. saw his arm around S.F. and that "they were laying close," but that R.S. did not see any actual sexual contact "for the purpose of sexual arousal or gratification." *Id*. Therefore, he contends the "only evidence" was S.F.'s testimony, and that she admitted she was asleep. *Id*.

The relevant question for an appellate court in reviewing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

The record shows Weston was 38 years old and S.F. was 14 years old at the time of the offense. S.F. testified Weston unzipped her shorts and touched her vaginal area at least a couple times while they were lying on the bed in the early morning hours of July 24, 2016. Although S.F. was asleep at times during that morning, she was awake during at least some of times when Weston was touching her beneath her underwear. Also, R.S. testified to seeing S.F.'s shorts unzipped and her shirt pulled up when S.F. woke up and was crying. Weston's text messages to R.S. also support S.F.'s and R.S.' description of Weston's statements and reaction after he was confronted by R.S. as to what happened.

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018). Accordingly, we find that when the evidence is viewed and construed most favorably to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt to support Weston's conviction.

### 3. EXCESSIVE SENTENCE

Weston assigns the district court erred by sentencing him to 3 years' imprisonment and 18 months' postrelease supervision, instead of probation or a lesser term of incarceration. Weston was convicted of one count of third degree sexual assault of a child under § 28-320.01(3), a Class IIIA felony. Under Neb. Rev. Stat. § 28-105 (Reissue 2016), a Class IIIA felony has a maximum sentence of 3 years' imprisonment and 18 months' postrelease supervision, or $10,000 fine, or both, with no minimum imprisonment, and 9 months' postrelease supervision if imprisonment is imposed. Although Weston's sentence was at the maximum term of imprisonment and postrelease supervision, it was nevertheless within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017). When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances

surrounding the defendant's life. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

Weston's PSI included a Level of Service/Case Management Inventory (LS/CMI) to "determine the degree of risk that [he] presents to the community and risk to recidivate." The PSI reveals Weston has a GED and was employed at the time of the crime, reports regular drug use, and has an extensive criminal record beginning in 1997, which, in addition to numerous traffic and driving under suspension offenses, includes: an assault and disturbing the peace (1997, fine); operating a motor vehicle while suspended, second offense (2001, probation, unsatisfactory discharge); assault, amended to disturbing the peace (2002, probation revoked in 2003); carrying a concealed weapon, amended to criminal attempt of a Class IV felony (2003, fine); third degree assault, amended to assault (2006, jail); strangulation, amended to third degree assault (2007, jail); disturbing the peace (2007, jail); and domestic assault, amended to third degree assault (2016, jail). Weston scored overall as a "high risk" to reoffend on the LS/CMI, and scored as a "very high risk" in 6 of the 8 criminogenic risk factor domains measured by the LS/CMI. Weston also participated in a specific assessment for sex-related offenses used by the Nebraska Probation System to determine the appropriateness of community supervision for a defendant convicted of a sex offense by using two scales, a reoffense risk scale and a violence scale. Weston was scored a "moderate low risk" for offending on this assessment.

Although the PSI states "[Weston] does not feel probation would work for him due to his usage of marijuana and wanting to gamble in Iowa," Weston's counsel argued at the sentencing hearing for a term of probation. Counsel argued that Weston has 15 children and probation would allow him to be present in their lives. Counsel also asserted that Weston has previously "availed himself of services while incarcerated to make himself into a better person, specifically, he's attended Within Reach parenting, Alcoholics Anonymous and Bible study." The State asked for the maximum sentence based on Weston's criminal history and his lack of "remorse for his crime."

The district court observed at the sentencing hearing that Weston had initially taken responsibility for his crime, but then had stopped doing so. The court stated there were substantial and compelling reasons why a term of imprisonment was necessary. The court noted Weston's "significant criminal history" and found that a lesser sentence would depreciate the seriousness of the crime and promote disrespect for the law. The court also noted there was a substantial risk Weston would engage in additional criminal conduct during probation. The court concluded that "the victim is certainly at no fault here. And certainly the actions of . . . Weston as the adult here, are his and his alone to . . . own."

Weston argues on appeal that "[a]lthough the District Court properly considered the nature of the offense and [Weston's] criminal history, these factors were given a disproportionate amount of weight, and the court failed to give proper weight to mitigating factors." Brief for appellant at 20. He also argues that the court abused its discretion "by placing a substantial amount of weight on [Weston's] perceived lack of remorse and failure to accept responsibility for the offense." *Id.* Weston asserts he has maintained his innocence, and "[i]t would be disingenuous to act remorseful or pretend to accept responsibility for an offense while also adamantly claiming innocence." *Id.*

Weston claims it is improper to punish an individual more harshly for failing to accept responsibility when innocence is claimed. "Doing so forces a defendant to choose between remaining steadfast or suddenly back-peddling in the hope it will reflect positively on the sentence." *Id*. Weston also argues the court failed to consider circumstances surrounding his life, such as his 15 children, and that he suffers from some mild mental health issues. He also points out that he was assessed as a moderate-low risk to sexually reoffend. Weston concludes that "a shorter sentence would both protect the public while also serving any rehabilitative needs of [Weston]." *Id.*

Sexual advances and assaults on minor children are serious offenses. See *State v. Patrick*, 227 Neb. 498, 418 N.W.2d 253 (1988). We find there is nothing in the record to indicate a disproportionate amount of weight was given to any of the factors the court was allowed to consider in its sentence. Instead, based on the information in Weston's PSI, and the court's stated reasoning, we find the district court's sentence was not an abuse of discretion.

## VI. CONCLUSION

For the reasons set forth above, we affirm Weston's conviction and sentence.

AFFIRMED.